840 F.2d 139
 The NORTH RIVER INSURANCE COMPANY, Plaintiff, Appellee,
v.
CY THOMPSON TRANSPORTATION AGENCY, INC., et al., Defendants,
Appellees.
Laurinda L. Davey, Personal Representative of the Estate of
Donald E. Davey, Defendant, Appellant.
The NORTH RIVER INSURANCE COMPANY, Plaintiff, Appellee,
v.
CY THOMPSON TRANSPORTATION AGENCY, INC., and CWT Freight,
Inc., Defendants, Appellants.
 Nos. 87-1790, 87-1791.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 8, 1988.
Decided Feb. 23, 1988.
 
 Ronald W. Lupton with whom Stinson, Lupton & Weiss, P.A., Bath, Me., was on brief for defendants, appellants.
 David C. King with whom Richard C. Smith and Rudman & Winchell, Bangor, Me., were on brief, for North River Ins. Co.
 Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 We write but briefly to explain the basis on which we affirm the judgment of the district court in respect to these consolidated appeals.
 
 
 2
 * Appellants Cy Thompson Transportation Agency, Inc. (CTTA) and CWT Freight, Inc. (CWT) were sister corporations under common ownership, engaged in cartage (interstate and intrastate). CWT owned no trucks; it conducted its business by using vehicles furnished either by CTTA (which owned a modest fleet) or by third parties. Effective June 15, 1984, appellee North River Insurance Company (Norico) issued a policy of liability insurance naming both of the corporate appellants as insureds. Some of CTTA's rigs--but fewer than all--were listed in the policy under the rubric "Covered Autos You Own." Coverage also extended to "hired autos."
 
 
 3
 Some six weeks later, tragedy struck in the form of a traffic accident in Nobleboro, Maine. At the time, one Morgan was operating a CTTA tractor which had been furnished to CWT for its use. The rig (a 1977 Kenworth) was not listed in the policy as a "covered auto." A motorist, Donald E. Davey, was killed. Davey's widow, Laurinda, sued CTTA (and eventually CWT as well) in Maine Superior Court. And Laurinda brought a separate state court suit against Betty J. Morgan (personal representative of the deceased truck driver's estate).
 
 
 4
 To truncate the tale, the trio of state court defendants asked Norico to defend the wrongful death claims and to provide indemnity up to the applicable limits of liability stated in the policy. Appellee declined the invitation, arguing that its coverage did not embrace a vehicle owned by a named insured but not "scheduled" in the policy. Thereafter, invoking diversity jurisdiction, Norico filed for a declaration of rights in the United States District Court for the District of Maine. Before the pleadings closed, CTTA, CWT, appellant Laurinda Davey, and Betty Morgan (who has not appealed) appeared as defendants. They asserted various counterclaims against Norico.
 
 
 5
 The parties consented to try the case before a United States magistrate, sitting without a jury. See 28 U.S.C. Sec. 636(c). Detailed findings of fact and conclusions of law were issued by the magistrate. The burden of his decision was that Norico afforded no coverage with respect to the accident. North River Ins. Co. v. CTTA, Civ. No. 85-0062 P, slip op. (D.Me. May 8, 1987). Judgment was entered in Norico's favor on its primary complaint and on the pending counterclaims. These appeals ensued.
 
 
 6
 Appellants make two principal contentions. They argue, first, that the magistrate was clearly wrong in determining that the 1977 Kenworth was excluded from the reach of the policy. Alternately, they assert that under the Maine Highway Transportation Reform Act, 29 M.R.S.A. Secs. 2701-2713 (1982) (MHTRA) and certain associated regulations, a finding of coverage was obligatory.
 
 
 7
 We have examined the record with painstaking care and find no reason to disturb the judgment. We explain why--but because appellants' asseverations were dealt with in extenso by the magistrate, we do not wax longiloquent.
 
 II
 
 8
 At oral argument, all parties agreed that Norico's policy was no model of clarity. Without doubt, the 1977 Kenworth was not covered thereunder as an "owned auto." What was less clear--what the letter of the policy did not seem definitively to resolve--was whether the Kenworth became a "hired auto" within the policy purview (ergo, covered) when furnished by its owner (CTTA) for the use of the other named insured (CWT). The question required the magistrate to ascertain the likely intention of the contracting parties. See RCI Northeast Services Division v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir.1987) ("where the plain meaning of a contract phrase does not spring unambiguously from the page or from the context, its proper direction becomes one for the factfinder, who must ferret out the intent of the parties"). See also Tinker v. Continental Ins. Co., 410 A.2d 550, 553-54 (Me.1980). In this instance the magistrate specifically found that,
 
 
 9
 ... the parties' intent here was clear: the entire purpose of enumerating only certain vehicles under the North River Policy was to reduce the coverage and thereby the premium. It would be inconsistent with this demonstrated intent to conclude that CTTA and CWT could maintain coverage on all the vehicles, for CWT usage, including the non-listed vehicles for which no premium was paid, by simply leasing those vehicles from CTTA to CWT for CWT's use.
 
 
 10
 Slip op. at 8-9, (footnote omitted). This finding is subject to review under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). RCI Northeast, 822 F.2d at 201-02; Edmonds v. United States, 642 F.2d 877, 881 (1st Cir.1981). Application of that standard suffices swiftly to draw the grease from the goose: although a plausible argument arguably can be made for another meaning (perhaps the parties contemplated that owned but non-scheduled units would be covered when furnished to a co-insured, and the premiums adjusted retrospectively under the policy's audit provisions), the magistrate's rendition of the parties' discernible intent is amply rooted in the record and in the commonsense practicalities of the negotiations for coverage. Cf., e.g., Bear v. United States Fidelity & Guaranty Co., 519 A.2d 180, 181 (Me.1986) (car owned by wife and not specifically listed in husband's policy could not serve as "temporary substitute" vehicle so as to attach coverage). Whether or not the record would also have supported some other finding, it comfortably accommodates this one. On the evidence as a whole, we are not "left with the definite and firm conviction that a mistake has been committed." In re Tully, 818 F.2d 106, 109 (1st Cir.1987) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Indeed, we think it likely that the magistrate's assessment of the risks which the insureds and the insurer meant to cover (or not) was close to the mark.[1]
 
 III
 
 11
 Appellant's second strike is equally unavailing. The MHTRA was enacted to regulate transporters--not insurers. See 29 M.R.S.A. Sec. 2702 (purpose of MHTRA is "to provide for a safe, reliable and efficient motor carrier system"). This was to be done by lowering entry barriers and stimulating competition, id., while at the same time locking into place "requirements for the safe operation of all freight and passenger carriers in the State." Id. Safety strictures were to be administered by the Bureau of State Police (Bureau). Id. The law contemplated that the Bureau would promulgate rules and regulations, see 29 M.R.S.A. Secs. 2702, 2707, and it did so in 1982.[2] With certain exceptions not material here, the MHTRA required the transporters to obtain operating permits and identification devices for their rigs. 29 M.R.S.A. Secs. 2703, 2704. The Bureau was directed not to "issue a permit covering the operation of any such motor vehicle ... until the applicant for that permit has procured a good and sufficient insurance policy...." 29 M.R.S.A. Sec. 2708.
 
 
 12
 Against this backdrop, we remark these uncontested facts:
 
 
 13
 1. Neither CTTA nor CWT ever secured a statutory permit or a vehicle identification device for the 1977 Kenworth.
 
 
 14
 2. Norico's policy was never filed with the Bureau as evidence of insurance for the 1977 Kenworth--or for any other vehicle, for that matter.
 
 
 15
 3. Norico never issued, executed, or filed a Form E certificate for the unit or for the corporate appellants.
 
 
 16
 These facts notwithstanding, appellants attempt to hold the appellee liable "as if" it had posted a policy or processed a Form E certificate. The argument simply will not wash. The statutory duty to procure an operating permit and a vehicle identification device devolves upon the transporter. 29 M.R.S.A. Secs. 2703, 2704. Inasmuch as obtaining and delivering "evidence of insurance" is a condition precedent to obtaining the permit, that responsibility, too, rests with the transporter.[3] The stipulated penalties for failure to carry sufficient insurance are addressed exclusively to the transporter. E.g., 29 M.R.S.A. Secs. 2707, 2711. Unless and until an insurance company signs a Form E certificate (or its equivalent) and authorizes a filing with the Bureau as evidence of insurance, it remains outside the sphere of the statutory/regulatory scheme. Given this legal landscape, it would be wildly inappropriate for a court to redraft the statute and the Regulations so as to impose liability upon an insurer which had never been asked--let alone agreed--to underwrite and certify the existence of coverage.
 
 IV
 
 17
 We need go no further. Where, as here, the trier, sitting jury-waived, has fully and fairly explored the issues, it would paint the lily for this court to set about covering the very same ground in expository fashion. We think the decision of the magistrate to be soundly constructed. Accordingly, subject only to the foregoing few embellishments, we adopt the magistrate's reasoning in substance and uphold the judgment on the basis of the opinion below. See North River Ins. Co. v. CTTA, Civ. No. 85-0062 P, slip op. (D.Me. May 8, 1987).
 
 
 18
 Affirmed.
 
 APPENDIX
 Insurance
 
 19
 A. No permit or decal will be issued by the Department of Public Safety Bureau of State Police (Bureau) until evidence of appropriate insurance has been provided for each motor vehicle to be operated. Such evidence may be in the form of an insurance policy or bond written only on forms approved by the Superintendent of Insurance, filed with the Bureau on the Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance (Form E) signed by an authorized representative of a company licensed to sell insurance in the State of Maine, certifying that coverage exists in no less amounts than as follows:
 
 
 20
 $350,000 Combined Single Limit of Liability for all damages because of bodily injury or death, including damages for care and loss of services, or property damage as a result of any one occurrence.
 
 
 21
 The limits of liability of the company on each motor vehicle shall be continuing notwithstanding any recovery thereunder, and shall not be less than the aforementioned limits. In filing evidence of insurance with the Bureau, the insuring company agrees to pay any final judgment recovered against the Insured for bodily injury to or death of any person or loss of, or damage to property of others (excluding injury to or death of the Insured's employees while in the course of their employment and loss of or damage to property of the Insured and property transported by the Insured designated as cargo), resulting from the negligent or willful operation, maintenance or use of motor vehicles, trailers or semi-trailers (including any motor vehicles, trailers or semi-trailers substituted for or added to those scheduled) under a permit issued to the Insured by the Bureau, or otherwise, within the limits required herein, regardless of whether such motor vehicles, trailers or semi-trailers are specifically listed in the policy or bond.
 
 
 22
 It is understood and agreed that upon failure of the Company to pay a final judgment recovered against the Insured, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment. The bankruptcy or insolvency of the Insured shall not relieve the Company of any of its obligations under the policy. Nothing contained in the policy or bond or any endorsement thereon, nor the violation by the Insured of any of the provisions of the policy or bond or any endorsement thereon shall relieve the Company from liability or from payment of any such final judgment. The liability of the Company extends to losses, damages, injuries or deaths whether occurring on the route or in the territory authorized to be served by the Insured or elsewhere.
 
 
 23
 Cancellation of a policy or bond on file with the Bureau shall not take effect until after thirty (30) days notice in writing by the Company on the Uniform Notice of Cancellation of Motor Carrier Insurance Policies (Form K), shall have first been given to the Bureau at its office in Augusta, Maine, said thirty (30) days notice to commence from the date notice is actually received by the Bureau.
 
 
 
 [1]
 Appellants' reliance upon a rule of strict construction as is discussed approvingly in Maine's cases, e.g., Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co., 521 A.2d 308, 310 (Me.1987) ("insurance policies are to be liberally construed in favor of the insured and strictly construed against the insurer"); Allstate Ins. Co. v. Elwell, 513 A.2d 269, 271 (Me.1986) (ambiguities in policy are to be "resolved against the insurer"), is mislaid. The Law Court has made it plain that this principle comprises "a rule of last resort which must not be permitted to frustrate the intention the parties have expressed, if that can otherwise be ascertained." Tinker, 410 A.2d at 554
 
 
 [2]
 See Bureau of State Police Regulations (16-222), ch. 4 (1985) (Regulations). Section 8(A) of the Regulations, the full text of which appears in the appendix, fleshed out the MHTRA's insurance requirements. It contemplated that the "evidence of insurance" necessary to underbrace issuance of a permit would comprise, in the usual case, a "Bodily Injury and Property Damage Liability Certificate of Insurance (Form E)" executed by the insurer and the subsequent filing of the Form E certificate with the Bureau. Id. This regulation was in force when Davey's fatal accident occurred
 
 
 [3]
 That the broker, Gary Bull, may have been requested by CTTA "to take care of filings with the Bureau concerning insurance coverage", slip op. at 4, does not require a different result. First, Bull "had no recollection of this conversation". Id. Second, there is no basis for concluding that, had Bull undertaken the assignment, he would have been acting as Norico's agent rather than as the corporate appellants' agent. Cf. Etheridge v. Atlantic Mut. Ins. Co., 480 A.2d 1341, 1346 (R.I.1984) (insurance broker, though acting as agent of company in issuing policy, was agent of insureds in giving advice). Third, there was no evidence that CTTA applied for a permit for the 1977 Kenworth; thus, Bull had no occasion to "take care of filings" anent that vehicle. And fourth, since no coverage was afforded for the Kenworth under the lone policy that Norico issued, see supra Part II, any "failure" on Bull's part to carry out his supposed promise was altogether immaterial in this case