**VIDEO CENTRAL, INC., Plaintiff,**

v.

**DATA TRANSLATION, INC., Defendant.**

**94–CV–11537.**

United States District Court, D. Massachusetts.

April 22, 1996.

Peter A. Biagetti, Joseph P. Messina, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Video Central, Inc., Plaintiff.

Richard D. Batchelder, Jr., Ropes & Gray, Boston, MA, for Data Translation, Inc., Defendant.

LASKER, District Judge.

Video Central, Inc. sues Data Translation, Inc. (DTI) for breach of contract and a declaratory judgment that it is no longer bound by the restrictive covenant contained in a written agreement between the parties. Video moves for summary judgment on the issue of liability.

Because a fact question as to whether the parties intended to be bound by the Letter of Intent exists, Video's motion for summary judgment is denied. While Video makes a strong argument that the Letter of Intent is binding as a matter of law, the ambiguous language of paragraph 14 and the Harpin and Travis affidavits, which unconditionally deny DTI's intent to be bound, tip the balance. It is impermissible, because it is not possible, to test the credibility of affiants who have not been subjected to cross examination. At trial, however, the finder of fact will have the opportunity to determine the credibility of the witnesses and whether there was a meeting of the minds as to the parties' intent regarding paragraph 14 of the Letter of Intent. However, because this case presents a good opportunity to clarify the law with respect to whether letters of intent are binding, this opinion details the reasons for denial of summary judgment.

## I.

Video is a distributor of products for broadcast and business video production. DTI develops, manufactures, and markets a variety of electronic equipment, including the Media 100, a high-performance video post-production computer board.

On August 2, 1993, Yosef Yosifove, President of Video Central, Inc., contacted Mike Travis, DTI's Director of International Sales and Marketing, to discuss the possibility of Video's becoming a distributor for the Media 100 in Argentina.

Pursuant to a two-page agreement titled "Letter of Intent" signed by Yosifove and Ellen Harpin, DTI's Vice President of Finance and Administration, on November 10, 1993, DTI granted to Video "the rights of exclusive resale in Argentina for the Media 100." The Letter of Intent set forth the

following terms: the duration period of two years from the date of signature, the discounted price of each Media 100 unit, the minimum volume of sales required of Video, and the restriction that Video "sell Media 100 only to Argentine customers in Argentina, and not to other countries." Paragraph 14 of the Letter of Intent states: "The parties agree to sign a contract formalizing these points no later than 60 days after the signature of this Letter of Intent."

Between November 10, 1993 and July 5, 1994, Video acted as a distributor for the Media 100 for thirteen customers in Argentina and one in Paraguay.

In January of 1994, DTI prepared and forwarded to Video two drafts of a formal contract appointing Video as an exclusive distributor for the Media 100. On February 21, 1994, DTI forwarded a third draft of the contract to Video, whereupon "Yosifove advised Travis that Video Central would sign the [third draft of the] Distribution Agreement." Video alleges that none of the draft contracts was ever signed by the parties because DTI "never delivered the document for execution"; DTI denies the allegation. (Compl. & Ans. ¶¶ 30.) Each of the three drafts of the formal contract was the subject of negotiations between Yosifove and Travis, and each draft contained a cure provision.[1]

On March 11, 1994, DTI faxed a "memorandum" to Video, stating that "Video Central ... do[es] not have the right to sell outside of Argentina. If it happens again we will stop using Video Central ... as our Argentina representatives." Video claims that "[a]fter it received DTI's admonishment, it unilaterally cancelled the remaining orders it had booked for customers in Paraguay."

On July 5, 1994, DTI sent a letter to Video terminating the "distribution agreement for Argentina [as] set forth in the Letter of Intent" because Video had made sales out-

side of Argentina "on at least one occasion ... in violation of the Agreement."

## II.

A. Was the Letter of Intent a binding agreement?

Video argues that the Letter of Intent included the "essential terms" of the agreement: that is, that Video would be a distributor of a DTI product (Media 100); in a particular area (Argentina); for an agreed upon term (two years); at a specified purchase price per unit (discounted 35 percent from the U.S. list price); and meeting a certain volume of sales to maintain its exclusive distributorship.

DTI contends that the Letter of Intent was merely "an agreement to agree" and that because the Letter of Intent did not address "complex" issues relating to the export of products, payment terms, copyright, trademark, and warranties or material terms such as covenants not to compete, assignment rights, arbitration, and governing law, it was not a binding agreement. Harpin asserts that "The Letter of Intent did not set forth all the essential terms of agreement between the parties.... The Letter of Intent did not contain all material terms that the parties intended would govern their relationship." (Harpin Aff. ¶¶ 6 & 7.) Michael Travis, DTI's Director of International Sales and Marketing and negotiator for the Letter of Intent, rejects Video's claim that the parties treated the Letter of Intent as a binding contract or abided by its terms; he stresses that

> [a]fter March 11, 1994, DTI did not fill Video Central's orders in accordance with the Letter of Intent, but instead filled them on an order-by-order basis consistent

---

1. Paragraph 7.C. of each of the draft contracts reads:

> In the event that either party shall at any time during the term hereof commit a material breach of this Agreement, the other party may, after thirty (30) days written notice of said breach and if said breach is not fully remedied during a said thirty (30) day period, forthwith

> terminate this Agreement upon the expiration of said Thirty (30) day period. The failure of either party to enforce at any time or for any period of time the provisions hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce each and every provision.

with the terminable-at-will status of its relationship with Video Central.

(Travis Aff. ¶ 18.)

■ Under Massachusetts law, a letter of intent may be binding if it includes "all material terms," even if the instrument indicates that the parties intend to execute a more detailed, formal agreement in the future:

[L]anguage looking to [the] execution of a final written agreement justifies a strong inference that significant items on the agenda of the transaction are still open and hence, that the parties do not intend to be bound. If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract.

*Goren v. Royal Investments, Inc.,* 25 Mass. App.Ct. 137, 140, 516 N.E.2d 173 (1987), *appeal denied,* 401 Mass. 1104, 519 N.E.2d 595 (1988). Whether the Letter of Intent is binding upon DTI depends, therefore, upon whether the agreement included "all material terms" or whether the negotiations between the parties were in a state of "imperfect negotiation." *Id.* at 140, 516 N.E.2d 173; *see also Novel Iron Works, Inc. v. Wexler Constr. Co.,* 26 Mass.App.Ct. 401, 407–408, 528 N.E.2d 142, *rev. denied,* 403 Mass. 1104, 530 N.E.2d 797 (1988) (where parties orally agree to "essential terms" of transaction, inference that formal contract is "mere memorial" permissible).

The Letter of Intent in the present case was signed by both parties and specified the rights granted by the instrument, the duration of the agreement, the price of the units to be distributed, the geographic limits of the distributorship, the minimum volume of sales required to maintain exclusive distributorship rights. It included sufficient material terms such that "the transaction [could], if necessary and finally determined to be appropriate, be consummated solely on the basis of the [letter]." *Rand–Whitney Packaging Corp. v. Robertson Group,* 651 F.Supp. 520, 534 (D.Mass.1986); *accord Labrecque v. Niconchuk,* 442 F.2d 1094, 1097 (1st Cir. 1971) (jury entitled to render verdict for plaintiff that everything material had been

settled where parties had agreed upon distributorship territory, product price, payment terms, control of distribution, and duration of contract).

A different finding was made in *Gel Systems v. Hyundai Eng'g & Constr. Co.,* 902 F.2d 1024, 1026 (1st Cir.1990), where the district court held that a letter of intent signed by both parties was not binding because 1) the letter expressed no more than future intention to purchase; 2) the letter referred to a formal contract to be executed in the future and stated: "Terms and conditions in detail will be further discussed when [a] formal contract is made"; and 3) the court perceived that "room existed for further negotiation and disagreement."

The Letter of Intent in the present case, however, is distinguishable from the agreement at issue in *Gel Systems:* It uses language in the present tense; it clearly spells out the terms under which DTI agreed to "assign[ ] the right of exclusive resale in Argentina for Media 100 ... to Video Central"; and there is no evidence to suggest that the Letter of Intent was signed at a point of "imperfect negotiation" between the parties.

DTI has not alleged that there were any "sticking points" in the negotiations over the Letter of Intent. *E.g., Mass Cash Register, Inc. v. Comtrex Systems Corp.,* 901 F.Supp. 404, 417 (D.Mass.1995) (agreement not binding where parties had not reached agreement as to material terms such as servicing of equipment, apportionment of service income, and geographic limitations, "which had always been the sticking point between the parties"). While Travis asserts that "during the negotiations ... over the terms of the draft contracts, several disagreements arose between the parties," these disagreements arose after the Letter of Intent was signed and involved matters not addressed in the Letter of Intent.

■ It is true that the Letter of Intent fails to address all of the issues raised in the subsequent draft contracts; Video does not dispute Harpin's assertion of this fact. However, that the draft contracts incorporate all the material terms included in the Letter of

Intent suggests that, at the very least, the parties agreed to those terms addressed in both the Letter of Intent and the draft contracts. The fact that a formal contract, which was

expected to include additional terms, and not just memorialize terms already addressed and agreed upon, [was to be executed] does not defeat the existence of a contract where, as here, the parties already agreed on all of the essential terms.

*Rand–Whitney Packaging Corp.*, 651 F.Supp. at 535; *accord Sands v. Arruda*, 359 Mass. 591, 270 N.E.2d 826 (1971) (fact that writing refers to formal document to be executed in future does not automatically prevent initial writing from being binding); *see also Novel Iron Works*, 26 Mass.App.Ct. at 408, 528 N.E.2d 142 ("It does not ... follow conclusively from [parties' intention to execute a formal contract] that the parties did not intend to be mutually bound to the terms agreed upon on that date until such time as the formal contract was executed").

■ Nonetheless, as indicated above, Harpin and Travis have sworn that DTI did not intend to be bound by the Letter of Intent until a formal contract was executed. While the cases cited by Video hold that a letter of intent can be binding, the courts in each of those cases ruled after a trial on the merits, which included an inquiry into the intent of the parties and the credibility of witnesses. Thus, although the Letter of Intent in this case appears to include all material terms, on the present record summary judgment cannot be granted because a fact question exists as to the intent of the parties.

By affidavit, Harpin, DTI's Vice President and signatory for the Letter of Intent, asserts that

DTI did not intend to be bound by any of the "points" set forth in the Letter of Intent until the parties signed a contract formalizing these points, and all other material terms that would govern the relationship between the parties. This intention not to be bound [was] reflected in paragraph 14 of the Letter of Intent, and was clearly understood by both parties.

(Harpin Aff. ¶ 4.) Travis states that

[u]ntil the parties signed one of the draft contracts, DTI did not believe it was bound

by such contract.... DTI believed that because the parties failed to sign a formal contract within 60 days of the signing of the Letter of Intent, as contemplated by the Letter of Intent, that it could terminate its relationship with Video Central at will, for any reason, or no reason, upon reasonable notice.

(Travis Aff. ¶¶ 7 & 9.) DTI's position is that paragraph 14 of the Letter of Intent, which provides that "[t]he parties agree to sign a contract formalizing these points no later than 60 days after the signature of this Letter of Intent," indicates that the parties did not intend to be bound by the Letter.

■ Any ambiguity in the Letter of Intent lies in paragraph 14, quoted above. Whether a writing is ambiguous is a question of law for the court to determine, but where the plain meaning of the contract does not "spring unambiguously from the page or from the context, ... the fact finder ... must ferret out the intent of the parties." *RCI Northeast Serv. Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987) *citing Freelander v. G & K Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970); *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir. 1981). Paragraph 14 can be construed to mean either 1) that the parties did not intend to be bound unless and until a formal contract was executed, as DTI argues, or 2) that the parties agreed to all the essential terms of the deal at the time the Letter was signed, agreed to be presently bound by such terms, and further bound to execute a formal contract within 60 days, as Video contends. Because paragraph 14 has neither a plain meaning nor only one meaning, and both parties' interpretations are reasonable, its language must be regarded as ambiguous.

■ Where the language of the contract is susceptible to more than one interpretation,

the court should construe the contract in the light of the situation and relation of the parties at the time it was made, and, if possible, accord it a reasonable and sensible meaning, consonant with its dominant purpose.

*See RCI Northeast Serv. Div.*, 822 F.2d at 203 (citations omitted). The parties' intent "is to be gathered, not from [a] single sentence ..., but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution." *Id.* citing *Miller v. Robertson*, 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed. 265 (1924).

Video points out that the language of the Letter of Intent says nothing to indicate that the parties did not intend to be bound. The language of the agreement is in the present tense, and paragraph 14, regarding the drafting of a "contract formalizing these points," does not provide for the dissolution of the agreement in the event a formal contract is not signed within 60 days of signing the Letter of Intent. *See Mendel Kern v. Workshop, Inc.*, 400 Mass. 277, 279, 508 N.E.2d 853 (1987) (where language of agreement cast in future tense, district court's conclusion that letter was "memorandum of future contractual intent" was not error).

The parties could have included a clause specifying that they did not intend to be bound until a more detailed, formal agreement was signed. Massachusetts courts have clarified that

> parties may provide that they do not intend to be bound until the transaction is buttoned up by a more detailed and formal agreement. There is commercial utility to allowing persons to hug before they marry. [However, a] proviso of that sort should speak plainly.

*Goren*, 25 Mass.App.Ct. at 137, 516 N.E.2d 173 (citations omitted). The fact that the parties did not include such a provision distinguishes the Letter of Intent in this case from the instruments at issue in *Schwanbeck v. Federal–Mogul Corp.*, 412 Mass. 703, 705 n. 2, 592 N.E.2d 1289 (1992) (no obligation to negotiate in good faith where expression of intention to proceed in good faith follows disclaimer stating that agreement "was not intended to create ... any binding legal obligation") and *Newharbor Partners, Inc. v.*

*F.D. Rich Co., Inc.*, 961 F.2d 294, 297 (1st Cir.1992) (no duty of good faith where letter stated that "nothing herein except the provision of (4) above will be deemed to create any legally binding obligations" and "The purpose of this letter is simply to set forth the basis on which the parties shall proceed in good faith"). However, the absence of such language does not establish, as a matter of law, that the parties intended to be bound.

Because the ambiguous language of paragraph 14 and the Harpin and Travis affidavits create a factual dispute as to whether the parties intended to be bound by the Letter of Intent, Video's motion for summary judgment on the issue of liability must be denied.[2] In light of this decision, a conference will be held with counsel to determine whether the remaining questions should be disposed of by motion or decided at trial.

It is so ordered.

---

**2.** DTI also argues that because the Statute of Frauds bars Video from relying on the language in the unsigned, draft contracts, it was not required to provide Video with an opportunity to cure. However, because Video does not rely on the draft contracts to establish that the "Letter of Intent" created a binding contractual obligation, DTI's argument is, as Video contends, inapposite.