**NEWHARBOR PARTNERS, INC.,**
**Plaintiff, Appellant,**

**v.**

**F.D. RICH CO., INCORPORATED and**
**F.D. Rich Company of Boston,**
**Inc., Defendants, Appellees.**

**NEWHARBOR PARTNERS, INC.,**
**Plaintiff, Appellee,**

**v.**

**F.D. RICH CO., INCORPORATED and**
**F.D. Rich Company of Boston, Inc.,**
**Defendants, Appellants.**

**Nos. 91–1360, 91–1422.**

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1991.

Decided April 8, 1992.

---

R. Daniel Prentiss with whom R. Daniel Prentiss and Associates, Providence, R.I., was on brief, for Newharbor Partners, Inc.

George E. Lieberman with whom Jerry H. Elmer and Licht & Semonoff, Providence, R.I., were on brief, for F.D. Rich Co., Inc. and F.D. Rich Co. of Boston, Inc.

Before BREYER, Chief Judge, BROWN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge,

This is an appeal of a judgment based on a directed verdict [1] in a diversity case. This case arises from failed negotiations to form a joint real estate venture.[2] The primary issue is whether or not a letter of intent executed by the parties gave rise to a duty to negotiate further in good faith despite express language that it created no legal obligations.[3] We hold that it did not and affirm the judgment of the trial court.

### A Match Made in Rhode Island

In the late 1980's, Newharbor Partners, Incorporated (hereafter Newharbor) made initial investments aimed at creating a mixed-use real estate development on Narragansett Bay in the cities of Providence and Cranston, Rhode Island. The linchpin for the development was an 82–acre tract owned by an individual, David Friedman. Newharbor paid Friedman $850,000 for an option to purchase the Friedman tract by September 27, 1988.

Having gone as far with the development as it could on its own, Newharbor began actively courting prospective equity partners for the project in late 1987. A suitable equity partner was needed generally to complete the project, but initially to purchase the Friedman tract before Newharbor's option expired. Furthermore, the financing arrangement worked out through David Friedman was contingent on Newharbor finding a sufficiently solvent partner.

In December, 1987, a real estate services company introduced several Newharbor principals to individuals identifying themselves as senior executives with the F.D. Rich Company (one of the Appellees; hereafter Rich[4]). The individuals explained

---

U.S. 1085, 110 S.Ct. 1822, 108 L.Ed.2d 951 (1990).

* Of the Fifth Circuit, sitting by designation.

1. At the close of the evidence, the appellees moved for directed verdict and, following some discussion, the trial court took the motion under advisement. That afternoon, the jury returned a verdict in favor of the appellant. The following morning, the trial court held a hearing and granted the appellees' motion for directed verdict.

   Procedurally, the trial court granted a *judgment non obstante veredicto* because the jury had already returned its verdict when the appellees' motion was acted upon. We review the judgment in light of the requirements for a judgment n.o.v. even though we use the trial court's designation of its action as a directed verdict.

2. All parties use the terms "partnership" and "joint venture" interchangeably throughout their briefs. The two types of business entities are, of course, distinct. Since it is not apparent from the face of the record, however, whether the putative "partnership/venture" was in fact supposed to be a partnership or a joint venture, we use the terms as used by the parties.

3. The arguments of all the parties are based on the following unnumbered paragraph which was contained in the letter of intent:

   The foregoing [the letter of intent] sets forth our understanding of the principal business terms of the proposed Partnership Agreement, but nothing herein except the provisions of (4) above [relating to the disposition of the deposit] will be deemed to create any legally binding obligations on either FDR [Rich] or NP [Newharbor]. The purpose of this letter is simply to set forth the basis on which the parties shall proceed in good faith toward the execution of a mutually acceptable definitive and appropriate partnership document.

4. The other appellee is a wholly owned subsidiary of Rich known as the F.D. Rich Company of Boston (hereafter Rich–Boston). As will be discussed further below, Rich–Boston was to be the

that Rich had successfully completed numerous real estate projects throughout the country.

In May, 1988, Newharbor and Walter Upton, identified as Senior Vice President of Rich, began serious negotiations aimed towards formation of a joint venture. In July, Upton proposed using a heretofore unmentioned subsidiary, Rich–Boston (the other Appellee) as the nominal partner in the joint venture. Newharbor approved the use of Rich–Boston in the negotiations provided that Rich itself would commit its resources to the project. Newharbor and Rich also agreed how their negotiations would proceed; they would execute a letter of intent and Rich would pay $100,000 as a good faith deposit, followed by final execution of the joint venture/partnership agreement and transfer of a one-half interest in the project to Rich. Several drafts of the letter of intent were exchanged prior to September, 1988, but none was executed.

Throughout the first half of 1988, Newharbor was engaged in serious negotiations with two potential equity partners; Rich and Forest City Development Company (hereafter Forest City). Both potential partners knew of the existence of the other and the other's general interest in the project. Both potential partners were aware of the terms and deadline for exercising the Friedman tract option and, therefore, the time constraints on formation of the joint venture. On September 23, 1988 (five days prior to the expiration of the Friedman tract option), Newharbor had scheduled a day long meeting with Forest City. Mr. Upton, who was aware of this meeting, had a courier deliver a photocopy of a $100,000 check along with a unilaterally signed copy of the letter of intent to Newharbor at Forest City's offices.

The letter of intent contained terms which Newharbor found very favorable. After reviewing the letter, Newharbor discontinued its negotiations with Forest City.

Newharbor and Rich revised the letter of intent several times. During the course of the negotiations, Newharbor's counsel requested the insertion of a clause regarding the non-binding nature of the letter. On September 27, 1988, Rich deposited the check for $100,000 in Newharbor's escrow account and the letter was executed in final form by both parties on October 10, 1988.

### Things Go Awry in R.I.

Immediately after executing the letter of intent, Newharbor and Rich began work on the final partnership agreement. At a meeting on October 24, 1989, Rich–Boston's attorney distributed a memorandum indicating that only three issues in the partnership agreement remained "open". By November 3, the remaining issues had been resolved and Upton and Mr. Haffenreffer (a Newharbor principal) agreed that the deal was done. On November 7, Newharbor and Rich–Boston submitted proposed transaction terms for the purchase of the Friedman tract to David Friedman. Friedman accepted those terms. A meeting was arranged for November 10, at which Rich–Boston and Newharbor would first complete the joint venture agreement and then, jointly, complete the purchase of the Friedman tract from David Friedman and his attorneys.

On the evening of November 9, Rich–Boston's attorney informed Newharbor that Rich demanded the right to use the Friedman tract to borrow the $2.5 million capital contribution which Rich, under the letter of intent, was to make to the joint venture. Essentially, Rich wanted Friedman to not only finance the purchase of the tract as previously agreed, but also Rich's participation investment in the joint venture. Such an arrangement would require Friedman to forfeit his right to approve secondary financing on the land, on which Friedman had previously insisted.[5] Fried-

nominal partner with Newharbor even though Rich was to commit its own funds to the project.

**5.** The initial option and sale agreement pertaining to the Friedman tract gave David Friedman the right to approve any secondary financing to be placed on the property subject to his first mortgage. Upton and the Riches were apparently aware of this provision and, at one point, contacted Friedman's attorney to learn the circumstances under which Friedman would approve secondary financing.

man flatly rejected this financing scheme.[6]

Haffenreffer telephoned Upton after learning of the financing demand. The parties dispute whether or not Upton agreed to rescind the demand during that telephone conversation and to pay for half of certain environmental studies related to the project.

At the November 10 meeting Upton refused to pay for the studies and the Rich attorney reiterated the demand to use the Friedman tract as collateral for financing Rich's capital contribution. Following a "heated discussion", the meeting dissolved in confusion.

Newharbor attempted to resuscitate the joint venture in order to fulfill the terms of the November 7 purchase proposal made to Friedman. On November 16, however, Rich–Boston's attorney contacted Newharbor's attorney and terminated the relationship and any further discussions. On November 18, 1988, Newharbor filed suit.

### The Jury Says Yes But the Court Says No

At trial, Newharbor alleged that the Riches had breached the duty of good faith and fair dealing expressly and impliedly contained in the letter of intent. The Riches, on the other hand, maintained that the non-binding clause in the letter meant no obligation in the letter could form the basis for a lawsuit. Specifically, the paragraph relied upon by all parties stated;

> The foregoing [the letter of intent] sets forth our understanding of the principal business terms of the proposed Partnership Agreement, but [i] nothing herein except the provisions of (4) above [relating to the disposition of the deposit] will be deemed to create any legally binding obligations on either FDR [Rich] or NP [Newharbor]. [ii] The purpose of this letter is simply to set forth the basis on which the parties shall proceed in good faith toward the execution of a mutually acceptable definitive and appropriate partnership document [enumeration added] [7].

The Riches moved for summary judgment immediately before trial on the basis that sentence [i] released them from any potential liability with regard to the letter of intent. The trial court wisely denied the motion but indicated that sentence [ii] could be construed to create a separate duty to use good faith in further negotiations. This tentative conclusion was diametrically opposite from the court's decision to grant the Riches' motion for directed verdict following the trial.

There is nothing unorthodox, however, about denying a motion for summary judgment because of a doubt whether triable facts existed and later granting a directed verdict after the critical facts had been developed, even if both motions were made on the same grounds. See, Voutour v. Vitale, 761 F.2d 812, 827 (1st Cir.1985) (on reh'g), aff'd, Town of Saugus v. Voutour, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). We have previously held that the partial denial of summary judgment does not preclude a motion for directed verdict following the close of evidence because facts presented in trial may enable the trial court to reach a determination as a matter of law. Id. Given the circumstances of this case, it would have been improper to grant the summary judgment in view of likely issues of fact relating to interpretation of the letter of intent.

The case was submitted to the jury on two theories: [i] that Rich and Rich–Boston had violated the duty of good faith and fair dealing; and [ii] that Rich and Rich–Boston had breached an actual obligation to pro-

---

**6.** In effect, Friedman would have been financing an amount in excess of the purchase price of the land. The purchase price was $21 million, $1.7 million of which was to have been a cash down payment. Thus, between subordinating his security interest to Rich's capital contribution and financing the balance on the purchase price, Friedman would have been financing $21.8 million.

**7.** As it appeared in the letter of intent, this paragraph did not contain the roman numeral sentence designations shown here in brackets. For purposes of clarity, however, we will refer to the two key sentences by the bracketed roman numerals which we have added.

vide financial support for the purchase of the Friedman tract which Newharbor contended was an enforceable obligation in the letter of intent. The Riches' counter-claim for the $100,000 deposit was tried to the court. The jury found that [i] the Riches had violated a duty of good faith expressly contained in the letter of intent but that [ii] the Riches had not been obligated to provide financial support for the purchase of the Friedman tract.

Prior to the return of the jury verdict, Rich and Rich–Boston moved for a directed verdict based, once again on sentence [i]. The morning after the jury returned its verdict, the court granted the directed verdict as to the findings on the breach of the duty of good faith, but entered judgment in favor of Newharbor on the Riches' counterclaim. Newharbor appeals the judgment based on the granting of the directed verdict. By way of cross-point, the Riches cross appeal the entry of judgment against them on their cross-claim.

### Fragmentary Tendrils Need Not Apply

■ Our accepted standard of review of an appeal from a directed verdict requires us to look at the evidence in the light most favorable to Newharbor and find whether a reasonable jury could have only reached the conclusion of the trial court. *Gray v. New England Tele. & Tele. Co.*, 792 F.2d 251, 253 (1st Cir.1986). While Newharbor is entitled to the benefit of every legitimate inference, its challenge to the directed verdict may not rest on conjecture or speculation. *Id.* As we have stated previously, a party complaining of a directed verdict on appeal must rely on evidence which consists of "more than fragmentary tendrils: a mere scintilla of evidence is not enough to forestall a directed verdict," especially on an issue as to which the burden of proof belongs to the appellant. *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1088 (1st Cir.1989).

### Good Faith Doesn't Grow on Trees

Next, we turn to the question of whether or not a letter of intent can ever give rise to a duty of good faith and fair dealing. The Riches argue forcefully that letters of intent never create legally binding obligations of any sort in Rhode Island.[8]

The Riches do acknowledge, however, that letters of intent are subject to varying interpretations regarding legal obligations to which they may give rise.[9]

■ The key appears to be not what the document in question is titled but to what

---

**8.** The Riches point to two Rhode Island Supreme Court cases as suggesting that Rhode Island will not recognize a contract to contract.

In the more recent of the cases, the Rhode Island Supreme Court warned that, "[b]usiness transactions require that parties to a contract be able to negotiate without fear that they will be bound by mere discussion." *Smith v. Boyd,* 553 A.2d 131, 134 (R.I.1989). In its earlier decision, the Rhode Island Supreme Court denied expectancy damages based on a contract which had never been completed. *Associates in Anesthesia v. Mutual Ben. Life,* 504 A.2d 477, 478 (R.I. 1986).

The enforceability of "contracts to contract", however, is not directly at issue in the case at bar. Newharbor has not alleged that the Riches breached the letter of intent by not following through with its terms for future negotiations. Instead, Newharbor argues that the letter of intent gave rise to an immediate duty to act in good faith. We, therefore, do not need to reach the issue of the current status of "contracts to contract" under Rhode Island law.

**9.** As the Riches point out, letters of intent are generally construed in two categories. Those which contain specific language regarding the non-binding nature of the letter are almost universally construed as not creating legal obligations of any sort. *See, e.g., Beaumont v. American Can Co.,* 621 F.Supp. 484, 493 (S.D.N.Y.1985) (letter of intent which stated that neither party would have liability or obligation under it was not binding contract), *aff'd,* 797 F.2d 79 (2d Cir.1986); *Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 197 (S.D.N.Y.1969) (letters of intent which state that they are non-binding are non-binding).

On the other hand, letters of intent without such language are construed differently by different jurisdictions; some holding that they are legally binding while others hold that they are not. *See, e.g. Channel Home Centers, Div. of Grace Retail Corp. v. Grossman,* 795 F.2d 291, 299 (3rd Cir.1986) (agreement to negotiate in good faith enforceable if requirements of contract met); *Chase v. Consolidated Foods Corp.,* 744 F.2d 566, 571 (7th Cir.1984) (agreement to negotiate binding as to duty to proceed in good faith).

extent the language in the letter of intent reflects the parties' intent to be, or not to be, legally bound. *See, e.g., Hill v. M.S. Alper & Sons, Inc.*, 106 R.I. 38, 47, 256 A.2d 10, 15 (1969). There are no public policy constraints on drafting a document which, in some respects, binds the parties to its terms while, in other respects, creates no obligations. The enforceability of such a document turns on the clarity with which such intent is expressed in the instrument.

■ Subject to the basic requirements of a contract, any two parties can contract to act in good faith towards the other. *See, Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3rd Cir.1986) (agreement to negotiate in good faith enforceable if requirements of contract met). Furthermore, Rhode Island has recognized an implied duty of good faith and fair dealing in every contract. *See, Psaty & Fuhrman, Inc. v. Housing Auth. of Providence*, 76 R.I. 87, 92, 68 A.2d 32, 35 (1949).

■ To the extent that a letter of intent is a legally binding contract, it would impliedly impose on its signatories a duty of good faith and fair dealing. Furthermore, if the letter were drafted clearly, there is no reason why it could not expressly provide for a legally binding mutual obligation to act in good faith while simultaneously containing a non-binding clause as to the rest of its terms.

### Just Because They Could Doesn't Mean They Did

■ The question in this case, then, is whether the letter of intent was drafted so as to give rise to a duty of good faith between Newharbor, Rich, and Rich–Boston. The language of sentence [i] is unequivocal on its face. In order to determine its *meaning*, however, we must look to other parts of the contract and principles of contract interpretation and see if the clause was subject to any affirmative obligations.

The Riches argue at length that sentence [i] was drafted by Newharbor and, based on the theory of *contra proferentum*, should be construed against it. Newharbor responds that the Riches misapply that canon of contract interpretation. Newharbor correctly points out that it was the drafter of the non-binding clause, not the entire contract. Furthermore, it contends that the rule of construction against the drafter is typically employed to compensate for imbalances in bargaining power. *See, RCI Northeast Services Div'n v. Boston Edison Co.*, 822 F.2d 199, 203 n. 3 (1st Cir. 1987). The Riches stretch even their slippery advocacy by maintaining that they were at a disadvantage in bargaining power with Newharbor. The fact that Newharbor furnished sentence [i] without specifically excluding a duty to proceed in good faith cannot be overlooked, however.[10]

All parties agree that the letter is legally binding as to paragraph 4, the provision dealing with the disposition of Rich's deposit. This is obvious from the express wording of the contract, "nothing herein *except the provisions of (4) above* will be deemed to create any legally binding obligations [emphasis added]." Had Newharbor intended the good faith reference to be excluded from the operation of sentence [i], it could have included language to that effect, just as was done regarding paragraph 4. No such reference was made.

A common principle of contract construction is that a specific term will control over a conflicting general term. *See,* Restatement (Second) of Contracts § 203(c) (1981). Similarly, it is only logical that a unequivocal term will control over a conflicting ambiguous term. As previously discussed, the non-binding clause is quite clear. The sentence on which Newharbor bases its argument, however, is far less obvious.

Sentence [ii] states, "[t]he purpose of this letter is simply to set forth the basis on which the parties shall proceed in good faith toward the execution of a mutually

---

**10.** It is interesting to note that Newharbor's attorney during the negotiations contemporaneously drafted a similar letter of intent for another client which, although containing a non-binding clause, did contain a specific provision for a binding obligation to act in good faith.

acceptable definitive and appropriate partnership document." Read alone, this sentence *might* reflect an intention of the parties to be mutually obligated to "proceed in good faith". It could just as easily reflect an intention of the parties to be obligated to execute "a mutually acceptable definitive and appropriate partnership document." It could also reflect a *goal* of the parties and not create any obligations. Were this sentence the only sentence at issue, Newharbor might have been entitled to have the jury interpret it. *See, Westinghouse v. Dial Media, Inc.,* 122 R.I. 571, 579, 410 A.2d 986, 991 (1980) (parties' intent underlying ambiguous contract is question of fact precluding summary judgment). It was not the only sentence at issue, however.

### Mean What You Say and Say What You Mean

While none of these interpretive observations alone is dispositive, they all gravitate towards the same conclusion. The letter clearly states that it is not binding except as to paragraph 4. The letter does not make an exception for a duty to act in good faith. The only reference to good faith to which Newharbor can point is couched in equivocal terms. When viewed in light of the non-binding clause, the letter is not susceptible to a reasonable interpretation that it created a mutually intended obligation to act in good faith. Newharbor's argument, while cogent and well-stated, is based on mere "slivers of evidence". The trial court, therefore, properly granted the Riches' motion for directed verdict and we affirm its judgment for defendants on the plaintiff's claim.

### No Insult Added to Injury

The Riches' counterclaim was tried to the court. The court, based on a factual determination that the Riches' bad faith had caused the demise of the negotiations, determined that the Riches were not entitled to return of the $100,000 security deposit. The Riches' have failed to meet their burden of showing that the trial court's decision was clearly erroneous. Accordingly, we affirm the trial court's judgment as to the Riches' counterclaim.

The judgment of the District Court is AFFIRMED.