**CAFÉ LA FRANCE, INC., Plaintiff,**

v.

**SCHNEIDER SECURITIES, INC., Defendant.**

No. C.A. 99–497–L.

United States District Court, D. Rhode Island.

Sept. 8, 2003.

362

John W. Ranucci, Esq., William H. Mason House, Providence, RI, for Plaintiff.

Barry J. Kusinitz, Esq., Providence, RI, for Defendant.

## OPINION AND ORDER

LAGUEUX, Senior District Judge.

Café La France, Inc. ("Café" or "Plaintiff") brought suit against defendant Schneider Securities, Inc. ("Schneider" or "Defendant") asserting alternative theories of harm stemming from the parties' failed pursuit of a public offering of Café's stock. Café's Second Amended Complaint[1] consists of five counts: Count I asserts a claim for breach of contract; Count II for breach of fiduciary duty; Count III sounds in estoppel; Count IV sets forth a claim for unjust enrichment; and Count V for misrepresentation.[2] Having tried the case without a jury, and reviewed the trial testimony, exhibits and post-trial memoranda, the Court now renders decision for Defendant on all counts.

## I. BENCH TRIAL STANDARD

Following a bench trial a court must enter findings of fact and conclusions of law, *see* Fed.R.Civ.P. 52(a), before proceeding to judgment. *See* Fed.R.Civ.P. 58.

## II. FINDINGS OF FACT

In 1989 Thomas DeJordy founded Café, a gourmet coffee shop and restaurant, with an eye towards expanding and ultimately either offering the company's stock to the investing public or becoming an acquisition target. By 1995, Café had grown from one to seventeen locations, the majority of which the company owned and operated, the remainder under the control of franchisees. DeJordy's vision called for more aggressive expansion, however, which required an infusion of capital. DeJordy had starbucks in his eyes. With the help of Henry Diamond, an investment banker employed by the New York firm Earnhardt & Company, Café raised $1 million through a private placement of its common stock. The proceeds from that offering were intended both to fund additional growth and to defray some of the expenses associated with preparing to take Café public.

At the end of 1995, in anticipation of a public offering of its stock, Café hired Robert G. King as vice president and chief financial officer. King came to Café with experience in the retail food and coffee industry, and in particular with companies that had gone public or been acquired by larger firms. One of his initial responsibilities was to develop a five year business plan for Café that contemplated the public offering.

Café's next task was to find an underwriter who would agree to assist in the promotion and sale of its stock offering. Among the firms Café approached was

---

1. Plaintiff, a Delaware corporation, originally filed an original and amended complaint in Rhode Island Superior Court for Providence County; Schneider, a Colorado corporation, subsequently removed the case to the Court based on the parties' diversity of citizenship. Plaintiff ultimately filed a Second Amended Complaint, which is the currently operative pleading.

2. During trial Schneider introduced evidence that Café's Delaware charter had become inoperative in 2002 for nonpayment of taxes. That status does not impair Café's ability to prosecute the instant lawsuit. *See Rockout v. Sgarlat,* 1997 WL 798244, at *1–*2 (E.D.Pa. Dec.16, 1997)(*citing* Del.Code Ann. tit. 8 § 278).

Schneider. James Twaddell, an investment banker in Schneider's Providence office, was an acquaintance of DeJordy's and had participated in the 1995 private placement of Café's stock. Café and Schneider held discussions in January of 1996 regarding Café's potential offering, at which point Schneider declined to assume the role of lead underwriter. It did, however, express interest in providing some form of assistance. Pl's Ex. 16.

In early July, 1996, Diversified Investors Capital Services of N.A., Inc. ("Diversified") proposed to help Café raise $5 million through an initial public offering, while also securing, in advance of that offering, an additional $500,000 in bridge financing, the latter necessary to provide for the costs associated with the initial public offering (IPO) process. Diversified could not actually underwrite the offering itself—it was not a registered securities broker-dealer—but proposed to procure a suitable firm to act as lead underwriter. According to DeJordy and King, any compensation paid to Diversified would have been contingent upon the success of the offering.

In hopes of negotiating a more advantageous capital structure with Diversified, DeJordy took the proposal to Twaddell for an opinion. Twaddell, in an apparent about-face for Schneider, suggested that Schneider might be better suited to take the lead. He pointed out the firm's IPO track record (saying that Schneider had never failed to see an offering through once it had signed a letter of intent), the resources available to it (20–30 offices across the country, manned by over 100 selling brokers), and played up the local angle (Diversified was a New York firm

without a Rhode Island home). He also apparently emphasized Diversified's inability to underwrite the offering itself. Twaddell then arranged a meeting between Café, represented by DeJordy, King and Diamond, and members of Schneider's Providence investment banking group, including Pat Ruggieri, the head of the Providence office, William Salmons and Twaddell himself.

The ultimate fruit of this meeting, which occurred sometime between July 3 and July 24, was a letter of intent ("LOI") from Schneider to Café, dated July 24, 1996, in which Schneider expressed its intention to underwrite Café's IPO on a "firm commitment" basis,[3] as managing underwriter. Pl's Ex. 5. The Schneider-led IPO would raise approximately $4.5 million.

Paragraph 8 of the LOI, entitled "Statement of Intent," recites in pertinent part:

> This document is a statement of intent. Its execution does not, either expressly or by implication constitute a binding agreement by [Schneider] or [Café] to undertake the financing outlined above or an agreement to enter into an underwriting agreement except as set forth in paragraphs 5(d), 8 and 9 hereof. Any legal obligations between the parties shall be only as set forth in a duly negotiated and executed underwriting agreement (the "Underwriting Agreement").

Paragraph 5(d) obligated Café to pay Schneider $25,000 upon execution of the LOI, while paragraphs 8 and 9 identify the nature of the parties' respective obligations as binding or nonbinding. DeJordy acknowledged at trial that in order to bind the parties to the IPO Café and

---

**3.** By engaging to promote an offering on a "firm commitment" basis, an underwriter guarantees at least the initial success of the offering by committing to purchase all of the shares being offered in the event that suffi-cient interest in the issue is not immediately attracted. By contrast, an underwriter proceeding on a "best efforts" basis merely promises, as the name implies, to attempt valiantly to find buyers for the securities.

Schneider would ultimately have had to execute an underwriting agreement.

As suggested above, Schneider's compensation was not wholly contingent upon the successful execution of the offering. Paragraph 5(d) required a $25,000 payment when the LOI was signed, while paragraph 5(e) called for payment of an additional $25,000 "at the time of the first filing of a Registration Statement with the Securities and Exchange Commission...."

A separate, contemporaneously dated LOI (the "Bridge LOI") set forth Schneider's intention to endeavor to raise bridge financing in the amount of $600,000, on a "best efforts" basis. Pl's Ex. 6. The Bridge LOI envisioned that the bridge financing would close in two stages, the initial closing taking place 60 days from the date of the Bridge LOI, with a final closing occurring 60 days later. As compensation, Schneider would receive 10 percent of the amounts raised. Like the LOI for the IPO, the Bridge LOI recited that it was nonbinding in nature, and that any legal obligations would have to be embodied in a separate placement agreement. Pl's Ex. 6. Café and Schneider executed the letters of intent, and Café remitted to Schneider $25,000 as per paragraph 5(d) of the IPO LOI.

Schneider first instructed Café to engage qualified legal counsel and an accounting firm to guide it through the IPO process. To that end Café retained Michael Sweeney of the Providence law firm of Duffy and Sweeney, and the accounting firm KPMG. Subsequently, Café, with the guidance of Sweeney and KPMG, devoted its energies to preparing the registration statement that must be filed with the Securities and Exchange Commission (SEC) prior to offering stock to the public. King testified that he spent four to five months preparing the statement in conjunction with Café's attorneys and accountants. In addition, Café began gearing up for its anticipated expansion by hiring and training employees and generally incurring greater administrative expenses in connection with the business.

At some point during the late summer or early fall of 1996, Café become anxious about its cash flow. Concerned that the deadline for the initial closing on the bridge offering was rapidly approaching with no word of subscribers from Schneider, Cafe determined that it needed an immediate infusion of capital to fund current operations. In an effort to "bridge the bridge," in other words, to tide over its cash needs until the closing of the bridge financing, Café, through the efforts of Diamond, went out and raised approximately $250,000 by issuing unsecured promissory notes. Upon learning of these loans, Twaddell, allegedly at the behest of Ruggieri, demanded that they be converted into subscriptions to the bridge offering. Citing the advice of their attorney, William Prifti, Schneider told Café that securities law concerns dictated that only one debt offering should precede the IPO. With the acquiescence of Sweeney, its own securities lawyer, Café acceded to Schneider's wishes, introducing the lenders to Twaddell, who appraised them of the benefits of the bridge offering and of the prospects of Cafe's IPO. All agreed to subscribe.

The testimony regarding the source of the balance of the bridge financing is conflicting. Café claims that DeJordy procured the remainder, while Twaddell indicated that at least one investor was a Schneider client. He also arranged a meeting with at least one other potential investor, local restaurateur Ned Grace, who ultimately declined to invest. In any event, the discrepancy is of no account.

Conversion of the unsecured notes to subscriptions in the bridge offering had two effects worth noting: first, instead of merely holding a promissary note from Café, each investor held subscriptions that

promised them, along with interest on their loans, preferred stock in the company; second, Schneider received a 10% commission, or $60,000,[4] on the amounts raised, as per the Bridge LOI.

The precise chronology of the bridge financing also remains hazy. Café prepared a Private Offering Memorandum dated September 12, 1996, describing the offering (and naming Schneider as placement agent); Café, Schneider and Union Bank & Trust executed an escrow agreement dated September 19, 1996; Café and Schneider then executed an Agency Agreement, as contemplated by the Bridge LOI, dated October 1, 1996, pursuant to which Schneider agreed to act as placement agent for the bridge offering on a best efforts basis; by letter dated October 25, Café requested an extension of the time required to close the offering, to 60 days from the date of the letter;[5] an October 24, 1996 letter from DeJordy to Schneider's Patrick Driver detailed $600,000 worth of commitments to the bridge financing, and discussed plans for closing. When, precisely, the offering actually closed is not apparent. Clearly, however, Café did raise $600,000 through the bridge financing, and paid $60,000 of those proceeds to Schneider.

*Schneider's Activities*

Schneider, for its part, kept abreast of Café's financial reports, which Café provided on an ongoing basis. According to Twaddell and Salmons, Schneider intended to market the IPO only after Café pro-

duced a preliminary prospectus, commonly referred to as a "red herring" due to the red legend printed on its cover indicating its provisional status. In the interim, Salmons and Twaddell, primarily the former, devoted more time to Café than anyone else from Schneider. Salmons estimated that he was spending sixty percent of his time working on issues related to Café's IPO and the bridge financing. His time was spent, among other activities, reviewing Café's financial reports, in conjunction with Café and KPMG, and determining how to present them in the registration statement.

The documentary evidence confirms Salmons' involvement with the deal from the very beginning. On July 29, 1996 he sent a memorandum to T.J. O'Rourke, Schneider's Denver-based president, outlining the terms of the contemplated IPO and bridge financing, and detailing Schneider's reasons for pursuing the IPO. Def's Ex. J. A September 11, 1996 memorandum to King suggests that Café present its financial data in a form similar to McDonald's, since Café planned to utilize a franchising strategy similar to that of the fast food behemoth. Def's Ex. U. A November 25, 1996 memorandum from Salmons to Schneider's investment banking group discussed the timing of the prospectus, and provided an update regarding Café's activities. Among the items discussed is the closing of Café's commissary, which produced baked goods for the restaurants, located at University Heights in Providence.[6] Salmons' memorandum com-

---

**4.** Schneider did not retain all of that sum, however, paying $32,520 to Earnhardt & Co. as a result of a sub-agency agreement it had executed with Diamond.

**5.** DeJordy testified without contradiction that Café wrote that extension letter at Schneider's request.

**6.** Café also maintained a retail location at University Heights, which is the source of

another dispute. DeJordy and King testified that that location, along with another in Barrington, Rhode Island, were underperforming and that Café had planned to shut them down. According to Café, someone at Schneider told them to keep the locations open, because sales figures were a more important component of a successful IPO than profitability. Neither Salmons nor Twaddell,

ments favorably on the decision to close the commissary.

After reviewing the prospectus, Salmons also generated a detailed set of comments that he eventually transmitted to Prifti, Schneider's attorney, for review. Def's Ex. HH. Following Cafe's initial registration, on December 18, 1996, Salmons wrote to KPMG of his discomfort with the way some of Café's financial data had been presented, and suggested changes. Def's E. CC.

Salmons and Twaddell testified that they also visited potential expansion sites in Boston with DeJordy and a commercial real estate broker. Salmons memorialized his impressions of those sites in another internal memorandum, dated January 15, 1997. Def's Ex. HH.

By late November, 1996, Café had presented a draft registration statement to Schneider for review.[7] On December 5, DeJordy and King were invited to a breakfast meeting with, among others, Twaddell, Ruggieri and Salmons. The Schneider representatives wanted to alter the terms of the IPO in response to Café's lower than expected financial results,[8] and to reflect depressed valuations throughout the retail coffee restaurant industry. Schneider proposed reducing the share price of the offering while increasing the number of shares that would be available. In addition, to encourage the confidence of potential investors, Schneider wanted DeJordy to escrow a portion of his stock in the company, to be transferred to Café in the event that certain financial targets were not achieved.

While unhappy with the proposed "haircut," DeJordy and King consented, and the parties signed a new LOI reflecting the changes on December 13, 1996. Café, in turn, revised its registration statement and filed it with the SEC on December 18, expecting to make at least one set of revisions before the registration became effective, at which point the securities could be sold.

At trial, several potential sources of Café's displeasure with the new terms emerged, none mutually exclusive. DeJordy individually was not thrilled at the prospect of putting a significant amount of his stock into escrow pending Café's future performance. DeJordy and King emphasized, however, that they were most concerned about the delay that would result from revising the terms of the deal. Up to that point, in Café's view, Schneider had already held up the process by failing to close the bridge offering in time. Revising the stock price and the number of shares being offered would require amending the registration statement, which would occasion additional costs and push back the date of effectiveness. Timing, moreover, was significant in this case, since KPMG had only audited Café's financial statements through September of 1996. Pursuant to SEC regulations, those reports would only remain fresh for 135 days, after which the fourth quarter financials would also have to be audited and included in the

---

the only Schneider representatives who testified, recalled giving those instructions.

7. Salmons, in his November 25 memorandum, anticipated receiving the draft by the following evening, November 26, and replying with comments by December 2. Def's Ex. V. Schneider introduced two separate documents, apparently different versions of the same set of comments prepared by Salmons, dated December 2. Def's Exs. Y–Z.

8. King testified that Café missed its financial projections only because its outside accountants, KPMG, had recommended a more conservative method of reporting and that resulted in increased "paper" losses. According to Café the higher losses did not in any way reflect negative changes in then-current operations.

prospectus, again incurring additional legal and accounting costs and even more delay. February 10, 1997 loomed as the deadline after which Café's financials would become stale and require supplementation. Despite misgivings, though, DeJordy and King agreed to the "haircut" and amended the registration statement accordingly.

Not long after filing the registration statement, Café began to inquire about Schneider's promotional efforts on behalf of the IPO, without receiving satisfactory responses. In late December 1996, Salmons sent to Café a sample presentation made by another coffee restaurant, on the basis of which Café was to develop its own presentation to take on a road show to promote the IPO. Def's Ex. BBB. At some point in early January 1997, Twaddell and Salmons met with DeJordy and King to critique their presentation.

Twaddell stated that he intended to initiate the promotional push on behalf of Café by arranging for DeJordy and/or King to attend the Regional Investment Banking Association ("RIBA") meeting in Florida that was scheduled for February 5 through February 7, 1997. Twaddell testified that Schneider wanted Café to respond to the SEC's first set of comments within 3 to 5 days of receipt, and then be able to hand out the revised, but not yet final, prospectus (the red herring) at the road show. Twaddell also testified that he explained this plan to DeJordy and King at some point during the period from December, 1996 to January, 1997. Salmons offered similar testimony.

Café's representatives did not attend the RIBA meeting, however. DeJordy and King testified that Twaddell merely suggested that they go to Florida to meet people, without emphasizing its importance, and that he gave them very little

advance notice of the conference. At that point, they said, their presence was required in Rhode Island to run the business. Twaddell, of course, maintained that he told them about the RIBA meeting earlier, either in December or early January.[9]

Testimony indicated that the SEC's normal practice is to review a registration statement and respond to the putative issuer with a comments letter detailing changes that the Commission would require prior to deeming the statement effective. The issuer would then revise the prospectus to reflect the comments; shortly thereafter the amended registration statement would become effective (absent additional comments from the SEC) and the issuer (or underwriter) could begin to sell the offering.

Café received a comments letter from the SEC on January 24, 1997. That same day, DeJordy initiated a meeting with Twaddell by inviting him to Café's offices. There, DeJordy and either King or Diamond told Twaddell that they were concerned about Schneider's perceived inactivity, and that a new firm, Tasin Securities ("Tasin"), from New York, had expressed interest in helping to move the IPO process forward. How Tasin made its appearance on the scene remains to this day a mystery. DeJordy claimed that Norm Goldstein, a Café shareholder who was an affiliate of Tasin, approached him in early January 1997, inquiring about the status of the IPO. King testified that Café's conversations with Goldstein began in November or December 1996. What is clear is that Tasin was eager to move in on the IPO in some fashion, and Café communicated as much to Twaddell on January 24, 1997.

---

9. At trial King testified that he learned about the RIBA opportunity late in January, after receiving the first round of SEC comments. At his deposition, however, he stated that Twaddell told them about the meeting while waiting for the comments.

The witnesses also gave conflicting accounts of the substance of that January 24 conversation. DeJordy testified that he merely suggested that Schneider could take advantage of Tasin's assistance in selling the IPO. Twaddell, on the other hand, remembered DeJordy telling him that Café had found a firm which would underwrite the offering at the original, pre-December 5 price, and which would not force DeJordy to escrow his shares. That is the most credible account of the meeting.

That same day, January 24, 1997, Twaddell recounted the meeting to Ruggieri and others at Schneider. According to Twaddell, Ruggieri's reaction to the introduction of Tasin was to say "What can we do? We've been fired." Nonetheless, Schneider eventually agreed to meet with Tasin on January 28, 1997, to discuss their potential participation. Among those in attendance were Goldstein and Christopher Janish for Tasin, Diamond for Café, and Twaddell, Salmons, and Ruggieri on behalf of Schneider. During the meeting, Tasin proposed participating in the IPO by taking one-half of the deal. Some testimony suggests that Tasin also proposed being the lead underwriter; other testimony asserts that the participants did not discuss the topic of who would take the lead role. By all accounts, the meeting was not hostile; Diamond, in fact, characterized it as "upbeat." The parties subsequently exchanged proposals for participating in the deal, though negotiations purportedly broke down when Schneider refused to display its name on the cover of the prospectus along with Tasin's.[10]

The testimony sheds little light on the parties' status over the course of the following weeks. Twaddell went to the RIBA meeting in Florida from February 5 to 7, 1997, and testified that upon his return he met with DeJordy, who told him that Tasin was out of the picture and that Café wanted Schneider to manage the offering pursuant to the terms of the December 1996 letter of intent.[11] DeJordy testified that he did not hear from Schneider again until February 10, 1997, when he and King met with Twaddell, who informed him that Schneider had considered itself fired after meeting with Tasin. The next day, February 11, 1997 Schneider sent a letter to Café terminating the parties' relationship. Twaddell ascribed the termination, which he maintained was Ruggieri's decision, to Café's failure to attend the RIBA meeting as well as the mistrust Schneider felt for Café's management after what Schneider viewed as Café's attempt to "shop the deal" to other underwriters, and specifically Tasin.

*Epilogue*

Ultimately, after another attempt to forge a deal with Tasin, Café engaged Earnhardt & Co., Diamond's firm, to underwrite the IPO on a best efforts basis. On April 25, 1997, Café's registration statement became effective; by June 3, Diamond and his colleagues had only been able to raise $1.5 million, far short of the level of funding Café had contemplated. In view of the shortfall, Café withdrew its registration statement and returned the money raised to the investors.

## III. CONCLUSIONS OF LAW [12]

---

10. Schneider was allegedly reluctant to affiliate itself so closely with Tasin because the latter had never taken a company public.

11. According to Twaddell, Michael Sweeney met with Ruggieri while Twaddell was at the RIBA conference and told Ruggieri that Café had not intended to fire Schneider.

12. Because the parties have not identified the state whose laws they wish to guide them, it falls to this Court to do so. Mercifully, that issue requires scant deliberation. Virtually all activity relevant to the case occurred in Rhode Island. Café, while eventually reincorporated in Delaware (upon the advice of

In its ardor for exposing malfeasance, Café proffers an entire menu of legal theories and invites the Court to select, ala carte, the hook on which to hang Schneider.

### Count I—Breach of Contract

■ The choicest, though still unappetizing, entrée on Café's bill of fare is its breach of contract claim. Café argues that the contract between the parties was partly oral, partly written, and thus encompasses both letters of intent along with the representations Schneider made in July of 1996 when persuading Café not to sign the letter of intent from Diversified. Unfortunately the evidence does not bear out Café's desired construction of events.

Most glaringly, the written documents themselves belie the contention that there was a contract between the parties that consisted of both written and oral representations and encompassed both the bridge financing and the IPO in one coherent scheme. Paragraph 7(f) of the October 1, 1996 Agency Agreement, which supplanted the Bridge LOI, recites that "[t]his Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement concerning the subject matter hereof."

Moreover, the amended LOI for the IPO explicitly identifies itself as a statement of intent only, with the exception of three provisions or sets of provisions. It reads, in pertinent part:

[t]his document is a statement of intent. Its execution does not, either expressly or by implication constitute a binding agreement by the Underwriter or the Company to undertake the financing outlined above or an agreement to enter into an underwriting agreement except as set forth in paragraphs 5(d), 8 and 9 hereof. Any legal obligations between the parties shall be only as set forth in a duly negotiated and executed underwriting agreement (the "Underwriting Agreement").

Pl.'s Ex. 12 at ¶ 8.

The foregoing leads to the conclusion that the LOI bound the parties, independent of the bridge financing agency agreement, only to paragraphs 5(d), 8 and 9, and that in the absence of an underwriting agreement there would be no other legal obligations with respect to the IPO. Schneider has not breached any of those provisions, and in fact, appears to have exercised its right, memorialized in paragraph 8, not to proceed with the offering if *"in its sole judgment ...* information comes to [Schneider's] attention relating to the Company, *its management* or its position in the industry which would, *in its sole judgment,* preclude a successful offering."* (emphasis added)

Twaddell testified that Schneider, and in particular Ruggieri, had lost faith in Café's management, purportedly because Schneider perceived that Café was soliciting other investment firms to underwrite its IPO. Other testimony, particularly that of DeJordy, cast some doubt on the veracity of that claim, and resolving the conflict is difficult without hearing from Ruggieri himself. Fortunately, parsing the testimony is unnecessary. The LOI clearly identified its three binding provisions, one of which left to Schneider's discretion the choice to decline to take the offering forward.[13]

---

Schneider), operated from Providence. Schneider, though it has Colorado roots and a national presence, maintained a Providence office which carried on the relationship with Café. Thus, under any conceivable choice of law analysis, whether "interest-weighing," *see Najarian v. National Amusements, Inc.,* 768 A.2d 1253, 1255 (R.I.2001), or "place of contract," *see Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 5 (1st Cir.1994), Rhode Island law controls.

**13.** Café apparently availed *itself* of the freedom of action afforded by the LOI: it paid the

Café's reliance on *Advisors Bancorp v. PaineWebber, Inc.*, No. 90–11301–JLT (D. Mass. April 17, 1995) is unavailing. In *Advisors Bancorp*, the Court held that a letter of intent to underwrite the plaintiff's public offering was a binding contract between the parties to the extent that it explicitly recited that certain provisions were binding. One of those binding provisions obligated the defendant investment bank to

> work closely with [Advisors Bancorp] and its counsel on all aspects of the offering, including, but not limited to, participation in the preparation of all necessary documents, *design and implementation of a marketing plan for the Offering*, and the obtaining of all requisite regulatory approvals, all as [Advisors Bancorp] or its counsel may reasonably request. . . .

*Id.* at 21 (emphasis and alterations in original).

The *Advisors Bancorp* Court held that PaineWebber had breached its contractual obligations to the plaintiff by inadequately promoting the offering to its brokers and customers. No analogous obligation on the part of Schneider to work closely with Café to market its IPO existed here. Café may have expected Schneider to do so, and at some point Schneider may have intended to, but that expectation was not incorporated into the binding portions of the LOI. Far from bolstering Café's argument that Schneider was bound to proceed in good faith to market the IPO, *Advisor's Bancorp* actually undermines it.

Schneider points to another case, *Newharbor Partners, Inc., v. F.D. Rich Co., Inc.*, 961 F.2d 294 (1st Cir.1992), that

first $25,000 owed pursuant to paragraph 5(d), but never remitted the second $25,000 which, according to section 5(e), was to be paid upon first filing of the registration statement. DeJordy claimed the parties had agreed to hold off on the second payment,

squares well with this one. In *Newharbor*, which originated in this district, the parties executed a letter of intent to enter into a real estate joint venture or partnership. That letter contained a provision that delineated the obligations conferred on the parties. It read,

> The foregoing [the letter of intent] sets forth our understanding of the principal business terms of the proposed Partnership Agreement, but nothing herein except the provisions of (4) above [relating to the disposition of the deposit] will be deemed to create any legally binding obligations on either FDR [Rich] or NP [Newharbor]. The purpose of this letter is simply to set forth the basis on which the parties shall proceed in good faith toward the execution of a mutually acceptable definitive and appropriate partnership document.

*Newharbor Partners* at 295 n. 3.

After a jury trial, Judge Torres granted defendant's motion for a judgment notwithstanding the verdict, finding that the above quoted language conferred no duty of good faith and fair dealing on Rich. *Id.* at 298. The Court of Appeals affirmed that judgment in an instructive opinion.

As an initial matter, the Court of Appeals made two observations that bear directly on this case. First it noted that letters of intent that declare themselves to be non-binding are almost universally honored as such. *Id.* at 298 n. 9. Second, it pointed out that documents purporting to bind their signatories to some provisions but not others are perfectly valid as long as the parties' intent to be bound in such a manner is clear. *Id.* at 298–299.

while Twaddell testified that he asked for the money on several occasions to no avail. Whatever the truth of the matter, paragraph 8 of the LOI bound Café to make only the first payment set forth in paragraph 5(d).

After the defendant in *Newharbor Partners* terminated the relationship between the parties prior to consummation of the contemplated partnership, the plaintiff, Newharbor, sued claiming that the defendant had breached its obligation to negotiate in good faith. That obligation, Newharbor argued, stemmed from the second sentence of the above-quoted provision, specifically: "[t]he purpose of this letter is simply to set forth the basis *on which the parties shall proceed in good faith* toward the execution of a ... partnership document." *Id.* at 295 n. 3 (emphasis added).

The Court of Appeals, however, held that the first sentence of the provision unambiguously limited the binding terms of the letter of intent to the payment of a deposit by the defendant. Applying the rule of contract construction that "a [sic] unequivocal term will control over a conflicting ambiguous term ...," the Court determined that the clear statement in the first sentence precluded finding the existence of a duty to negotiate in good faith. *Id.* at 299–300.

After separating the wheat from the evidentiary chaff, Café and Schneider's relationship emerges resembling the one maintained by the parties in *Newharbor Partners*. More importantly, the LOI for the IPO that binds them together, quite clearly the key document in this case, identifies three and only three provisions that impose binding obligations. None of those provisions required Schneider to market or plan to market the IPO, and one of them, paragraph 8, explicitly gave Schneider the right not to proceed with the offering at its discretion.

Notably, beyond pointing out the promotional inactivity, Café cannot specifically say what Schneider *should* have done. Were they obligated to form a selling syndicate made up of other brokers? Ought they have been forced to tout the IPO to all of its offices across the country? Would just half do? Two-thirds? At what point would Schneider have been obliged to execute an underwriting agreement?

Because the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement, and because the LOI for the IPO contemplated Schneider's withdrawal, Café's breach of contract claim fails. *Cf. Health & Community Living, Inc. v. Goldis Financial Group, Inc.,* 1998 WL 117928, at *4 (E.D.N.Y. March 13, 1998).

*Count II—Fiduciary Breach*

■ Divining the existence of a fiduciary duty is a fact-intensive enterprise. *See A. Teixeira & Co., Inc. v. Teixeira,* 699 A.2d 1383, 1387 (R.I.1997)(holding that in a small closely held corporation where each shareholder in effect acts as a partner in the business, each shareholder is a fiduciary). Among the relevant factors are the degree to which one party relies upon the other, the history of the parties' relationship preceding the incident spawning the alleged breach, the parties' relative levels of business sophistication, and the willingness of one party to accept guidance from the other. *See Simpson v. Dailey,* 496 A.2d 126, 129 (R.I.1985).

■ The Rhode Island Supreme Court has not addressed the duty that an investment bank or securities underwriter owes to its client issuer. Other courts have, and have acknowledged that such a relationship may give rise to fiduciary responsibilities. *See MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,* 216 F.Supp.2d 251, 260 (S.D.N.Y.2002)(holding that plaintiff had pleaded sufficient facts to survive motion to dismiss); *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 2002 WL 362794, at *9 (S.D.N.Y. March 6, 2002)(collecting New York cases).

Café argues that Schneider portrayed the relationship between the parties as one

based on trust, and enticed Café into trusting it by representing that Schneider was better situated than Diversified to effect Café's IPO. Café also asserts that the IPO process is nothing more than corporate promotion, and that since corporate promoters owe a fiduciary duty to the corporation, *see Anderson v. Johnson,* 45 R.I. 17, 26, 119 A. 642 (1923), so, by extension, do putative underwriters. Both arguments fall short of their intended target.

To the extent that Schneider snared Café with its siren song of "trust us," that song consisted of no more than corporate puffery. Café claims to have been lured away from the Diversified proposal in July of 1996 by the representation that Schneider had 20 to 30 offices throughout the country with a network of 150 to 180 selling brokers, and had a record of taking firms public. Believing that those factors made Schneider a more attractive underwriter, Café selected it. A sales pitch, however, does not a fiduciary relationship create. Were that the case, each of millions of commercial transactions that take place every day would give rise to duties that far exceed the scope of the relationships that created them. While Schneider certainly expected Café to trust it, so too does every merchant who contracts with another "trust" the other party to perform.

As Café acknowledges, it was no "commercial innocent" being led down some primrose path by a rapacious corporate villain. Café initiated a relationship with Schneider from which each party expected to gain a mutual benefit—namely financial reward. DeJordy had some experience in the securities industry. Café hired King specifically because he had gone through the process of taking restaurants public. Of course Schneider held superior knowledge regarding the IPO process, and of course Café relied on that knowledge. The same is true of any commercial relationship, however; were it otherwise each

entity would be entirely self-sufficient. In short, Café simply has not demonstrated that the trust and confidence that it reposed in Schneider was sufficient under the circumstances to create a fiduciary relationship. The LOI for the IPO defined the relationship.

Nor is the underwriter—issuer relationship as analogous to the promoter—corporation relationship as Café would like. A corporate promoter is one who, alone or with others, participates in the formation of a corporation or some other joint business venture, and takes steps to put it in a position to transact the business for which it is intended. *See* Black's Law Dictionary 712 (6th Ed.1990)(*citing Dickerman v. Northern Trust Co.,* 176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423 (1900)); *Moneywatch Cos. v. Wilbers,* 106 Ohio App.3d 122, 665 N.E.2d 689, 692 (1995)(*quoting Yeiser v. United States Bd. & Paper Co.* 107 F. 340, 344 (6th Cir.1901)). Naturally, the promoter owes a fiduciary duty to the incipient corporation, owing to the promoter's unique position. An issuer is simply much less vulnerable to a potential underwriter of its public offering, as the underwriter, who was chosen by the corporation, can only exert as much influence as the issuer permits. The likeness is far too vague to permit attribution of the promoter's fiduciary duty to an underwriter.

■ Even assuming for the sake of argument that Schneider owed Café a fiduciary duty, the evidence does not demonstrate that Schneider flouted its responsibilities. The Second Amended Complaint frames the breach as Schneider's abandonment of Café on the eve of effectiveness, at a time when Café was vulnerable because of the efforts expended to go public. The LOI for the IPO contemplated this eventuality, however, by vesting Schneider, in one of the three explicitly binding provisions of that LOI, with the discretion not to go forward

with the IPO. Pl's Ex. 12 at ¶ 8. Schneider cannot now be guilty of fiduciary breach for exercising that right, in the absence of proof that it did so without any justification.

Café, of course, argues that there was no justification, and that Schneider was stringing it along merely to collect as many fees and commissions as it could before actually having to expend resources to purchase Café's securities. To be sure, Schneider's proffered explanation is not entirely watertight. Most glaring is the absence of any testimony from Ruggieri, whose judgment gave rise to the February 11, 1997 letter terminating the relationship. However, Cafe cannot overcome the shadow cast by Tasin's involvement, which ultimately led Schneider to question Café's motives. This Court concludes that De-Jordy did "shop the deal" to avoid the "haircut" and thus Schneider had cause to mistrust Café's management and choose to step away from the project.

*Count III—Equitable Estoppel*

■ A party asserting equitable estoppel must prove that it detrimentally relied, whether by action or forbearance, on some conduct of the opposing party. *See El Marocco Club, Inc. v. Richardson,* 746 A.2d 1228, 1233 (R.I.2000)(*quoting Providence Teachers Union v. Providence School Board,* 689 A.2d 388, 391–92 (R.I. 1997)). In the Second Amended Complaint, Café references three decisions that it allegedly made in reliance on Schneider's conduct or promises: to abandon Diversified in favor of Schneider, to incur $600,000 in debt through a bridge financing, and not to close two unprofitable locations. None suffice to make out an estoppel claim.

Briefly: the LOI outlined the terms of the IPO and recited which of those terms were binding on the parties, precluding an estoppel claim based on any sales pitch Schneider made to Café. *See Zarrella v. Minnesota Mut. Life Ins. Co.,* 824 A.2d 1249, 1260 (R.I.2003). Similarly, the bridge financing was the subject of the Bridge LOI, which was supplanted by the placement agency agreement executed by the parties, again squelching an estoppel claim. *Id.* Finally, the decision to keep the unprofitable locations open, see *supra* at n. 6, is no more fruitful a source. Café made a business decision based on what DeJordy and King admitted appeared to be sound advice from Schneider. When the relationship between the two soured, and Café ultimately was forced to withdraw the IPO, the potentially beneficial impact of that decision could not be realized. The harm Cafe suffered as a result of keeping the locations open would have occurred one way or another—Café complains only because that harm was not offset by the inflow of capital from the IPO.

*Count IV—Unjust Enrichment*

■ Red herrings play more than one role in this affair. Café premises its unjust enrichment claim on another one: the conversion of the unsecured loans raised by Café and Henry Diamond to subscriptions in the bridge offering. Café contends that Schneider was unjustly enriched by virtue of receiving $60,000 in commissions on money that it did not in fact raise. It alleges that Schneider coerced the conversion by threatening to withdraw from the IPO process if Café did not convert the loans.

For Schneider's part, Twaddell testified that Prifti, Schneider's securities attorney, warned Schneider that the existence of the outstanding loans threatened to create an "integration" problem with respect to the bridge offering.[14] Café now challenges that legal analysis as specious, but apparently neither it nor its securities counsel

---

**14.** "The integration doctrine is a method used    to combine two or otherwise exempt securi-

did so at the time, instead willingly acquiescing in the conversion.

Unjust enrichment is an equitable doctrine that, in the absence of an enforceable contract, allows a plaintiff to recover a benefit transferred to a defendant if that defendant's ongoing possession would be inequitable. *See Doe v. Burkland,* 808 A.2d 1090, 1095 (R.I.2002). Café and Schneider, however, had an enforceable contract for the solicitation of bridge financing that they ultimately executed. Not only was there a LOI separate and distinct from the LOI that anticipated the IPO, but the parties actually entered in to a binding agency agreement pursuant to which Schneider agreed to assist Café in placing $600,000 in bridge subscriptions on a best efforts basis. Testimony and documentary evidence demonstrate that Café and Schneider raised $600,000, and that Café paid 10% of that amount to Schneider as per the agency agreement. Café fulfilled its contractual obligations; if it was dissatisfied with Schneider's performance with respect to the bridge financing, its recourse lay in contract, not unjust enrichment.

*Count V—Misrepresentation*

■ Café's misrepresentation claim is something of a mystery. According to the Second Amended Complaint, the source of the claim was Schneider's advice not to close the University Heights and Barrington locations, in order to maintain a higher level of sales. Read most generously, the allegedly false and misleading statement was Schneider's representation, implied in the advice not to close the stores, that it was promoting or intended to promote the IPO, when in reality neither was true.

Plaintiff's pre- and post-trial memoranda cast different light upon the claim. Before trial Café's papers briefly touched upon the misrepresentation claim, but in doing so characterized it as a claim for negligent, not intentional misrepresentation. Moreover, in its post-trial memorandum Café strayed from the Second Amended Complaint by arguing that the misrepresentation was Schneider's contention that in promoting the IPO its Providence team would have the support of the firm's entire national network of resources.

In any and all events, the misrepresentation claim fails for lack of proof. A successful misrepresentation claim requires evidence that Defendant " 'made a false representation intending thereby to induce plaintiff to rely thereon'...." *See Stebbins v. Wells,* 766 A.2d 369, 372 (R.I.2001)(*quoting Travers v. Spidell,* 682 A.2d 471, 472–73 (R.I.1996)). At best, Café has mounted a campaign of circumstantial evidence that might lead the extremely credulous to the inference that Schneider never intended to promote Café's IPO but mislead Café to the contrary.

The strongest piece of evidence to that effect is the apparent dearth of concrete promoting activity on Schneider's part. Twaddell attributed this inertia to the lack of a "red herring" with which to promote the offering, testifying that, while forbearance was not legally mandated, it was Schneider's practice not to make efforts to promote without a preliminary prospectus in hand. Café offered no evidence to the contrary, but argues that in light of Schneider's failure to procure substantial

ties sales as a single offering. It serves as a means of ensuring investor protection by preventing issuers from circumventing the registration requirements by claiming a combination of exemptions for a series of transactions that would otherwise comprise a single offer-

ing requiring registration." *See Walker v. Montclaire Housing Partners,* 736 F.Supp. 1358, 1364 (M.D.N.C.1990)(citing T. Hazen, *The Law of Securities Regulation* § 4.29 (2d ed.1990)).

funds for the bridge offering, and the circumstances surrounding the termination of the parties' relationship, Twaddell's testimony was disingenuous.

While the indirect evidence does suggest that Schneider's proffered motives may have been more opaque than Twaddell described, it simply does not permit the conclusion that Schneider made any misrepresentations, either at the outset of the relationship, or in the course of advising Café to keep its less profitable locations open. Mere conclusory statements regarding Schneider's state of mind, particularly in light of the attention that Schneider did actually devote to the IPO, do not suffice to prove a misrepresentation.

## IV.  CONCLUSION

For the foregoing reasons, this Court concludes that Defendant Schneider Securities, Inc. is entitled to judgment on all five counts of Plaintiff's Second Amended Complaint.

The Clerk shall enter judgment for Defendant, forthwith.

It is so ordered.